UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DANIEL A. SCHMITT,                      )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )        Case No.: _____
                                        )
COVAN HOLDING COMPANY, LLC,             )
                                        )
            Defendant.                  )

## COMPLAINT FOR DECLARATORY JUDGMENT

### INTRODUCTION

1.      This action is about a denial by the Defendant, Covan Holding Company, LLC ("Covan Holdings" or "Defendant"), of Daniel A. Schmitt's ("Schmitt" or "Plaintiff") minority ownership interest in Covan Holdings and Defendant's refusal to provide financial and other information regarding Covan Holdings.  Plaintiff is an equity owner of the Defendant pursuant to the Defendant's Second Amended & Restated Operating Agreement dated August 16, 2021 ("Amended Operating Agreement"). As an equity owner, the Amended Operating Agreement entitles Plaintiff to review the books, records and other documents regarding the operations and the financial affairs of the Defendant. Plaintiff seeks to sell his ownership interest of Defendant (as permitted pursuant to Article VII of the Amended Operating Agreement) for which he seeks to receive for review the requested documents and information in order to establish the value of his ownership interest. Defendant has failed and refused to produce the requested documents. Plaintiff hereby seeks a declaratory judgment from this Court to confirm his ownership interest and his right to receive the requested documents and information.

## PARTIES, JURISDICTION AND VENUE

2.    Schmitt is a resident of the Commonwealth of Virginia residing at 206 Rock Hill Church Road, Stafford, Virginia 22556.

3.    Covan Holding is a limited liability company formed and registered on or about June 11, 2018 in West Virginia and operating at 3592 Collins Ferry Road, Suite 200, Morgantown, WV 26505.

4.    This Court has subject matter jurisdiction of this controversy pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 2201 because this is a declaratory judgment action wherein there is complete diversity of citizenship between the domestic and foreign parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.    Venue is proper in the Alexandria division of the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff is a resident of Virginia and relevant transactions between the Parties occurred within the Alexandria division.

## FACTUAL BACKGROUND

6.    On or about May 31, 2018, Zenovy Wowczuk ("Wowczuk") and Schmitt, acting as Members and Officers of the Defendant, executed and adopted the Operating Agreement of Covan Holding Company, LLC ("Original Operating Agreement").  Exhibit A to the Original Operating Agreement showed Wowczuk as owner of 60% of the Class A Units of the Defendant and Schmitt as owner of 40% of the Class A Units of the Defendant.

7.    On August 16, 2021, Wowczuk and Adam Hanasky ("Hanasky"), acting in their stated capacities as "The Remaining Board of Directors of Covan Holding Company, LLC", adopted the following Resolutions:

> 1. That Daniel Schmitt's June 1, 2020 withdrawal from Covan Holding, pursuant to Section 7.10 of the Operating Agreement, is

revered [sic] his 40,000 of Class A Units are reinstated, as accepted by the Board and ratified by a Majority-in-Interest of the Members;

2. The Board and Members agree to develop and execute any and all necessary documents to effectuate the above described actions and to develop and implement an amended and restated operating agreement.

*See* Covan Holding Company, LLC Unanimous Actions of the Board and Members, attached hereto and made a part hereof as Exhibit 1.

8.      On or about August 16, 2021, Wowczuk and Hanasky, stated to be the Members and Officers of the Defendant, authorized the adoption of and entered into the Second Amended & Restated Operating Agreement of Covan Holding Company, LLC ("Amended Operating Agreement"), a copy of which is attached hereto and made a part hereof as Exhibit 2.

9.      Section 3.1 of the Amended Operating Agreement states:

Prior to or concurrently with the execution of this Agreement, Zenovy Wowczuk and Daniel Schmitt contributed and delivered to the Company the cash amount set forth in Exhibit A hereto. In consideration for such Capital Contributions, the Company has issued to each of Zenovy Wowczuk and Daniel Schmitt, respectively, the number of Units of membership interests designated as "Units" as set forth in Exhibit A, and Zenovy Wowczuk and Daniel Schmitt were credited by the amount set forth in Exhibit A.

10.     Guard Unit, LLC ("Guard Unit") is a Delaware limited liability company. Covan Holdings owns 170,000 of the Class A Units or 62.9% of the ownership interests of Guard Unit. Prior to August 24, 2022, Schmitt was an employee and served as the President and Chief Executive Officer of Guard Unit. By agreement, Schmitt resigned from Guard Unit as of August 24, 2022.

11.     On or about October 18, 2022, Schmitt and Guard Unit executed the Confidential Separation Agreement and Mutual General Release ("Separation Agreement"), a copy of which is attached hereto and made a part hereof as Exhibit 3.

12.     In the Separation Agreement, Schmitt is defined as the "Employee", Guard Unit is defined as the "Employer" and Covan Holdings is defined as one of several "Released Parties". Using these defined terms, Section 2 C. of the Separation Agreement provides:

> Employee understands and agrees that Employee is releasing all known and unknown claims, promises, causes of action, or similar rights of any type that Employee may have (the "Claims") against any Released Party arising out of or in any way related to Employee's employment with Employer, the terms and conditions of Employee's employment with Employer, and the continuing effect thereof.

*See* Exhibit 3.

13.     Section 2 C. (vi) further provides:

> Unknown Claims. Employee understands that Employee is releasing Claims that Employee may not know about. Employee knowingly and voluntarily intends to release these Claims, even though Employee recognizes that someday Employee might learn that some or all of the facts Employee currently believes to be true are untrue and even though Employee might then regret having signed this Release. Nevertheless, Employee is assuming that risk and Employee agrees that this Release shall remain effective in all respects in any such case. Employee expressly waives all rights that Employee might have under any law that is intended to protect Employee from waiving unknown claims and Employee understands the significance of doing so.

*See* Exhibit 3.

14.     The Separation Agreement deals only with Schmitt's employment by Guard Unit and the defined term "Claim" deals only with claims concerning Plaintiff's employment. There are no provisions in the Separation Agreement regarding Schmitt's ownership interest in Covan Holdings.

15.     The Separation Agreement does not release any claim Schmitt has with regard to his ownership interest in Covan Holdings.

16.     On February 6, 2023, Wowczuk and Hanasky, stated to be members of the Board of Directors of Covan Holdings, adopted a resolution reversing the August 16, 2021 resolution, which had reinstated Schmitt's ownership interest in Covan Holdings.

17.     The action by Wowczuk and Hanasky on February 6, 2023 was taken only after Schmitt asserted his rights as an owner of Covan Holdings to review the operational and financial documents of Covan Holdings to establish the value of his ownership interest.

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.     A declaration that, notwithstanding the February 6, 2023 resolution of the Board of Directors of Covan Holdings, Plaintiff currently holds a 40% ownership interest in Covan Holdings and cannot be disenfranchised of his ownership interest without compensation;

2.     A declaration that Plaintiff is entitled to receive from the Defendant the documents requested; and

3.     Such other and further relief as the Court finds just, proper and equitable.

Dated: March 2, 2023                    Respectfully submitted,

                                        /s/ *Daniel A. Schmitt*
                                        Daniel A. Schmitt

Craig B. Young (VSB 22633)
Kutak Rock LLP
1625 Eye Street, NW, Suite 800
Washington, D.C. 20006
(202) 828-2328 Direct
(703) 994-0873 Mobile
craig.young@kutakrock.com

*Counsel for Plaintiff*

**COVAN HOLDING COMPANY, LLC**
**UNANIMOUS ACTIONS OF THE BOARD AND MEMBERS**

The undersigned, being the remaining Board Directors and remaining Members, as noted, of Covan Holding Company, LLC, a West Virginia limited liability company ("Covan Holding"), pursuant to Sections 5.1, 5.2, 5.4, 6.1, 6.2, 6.3, 6.4, and 7.1, 7.10, et seq. of the Operating Agreement of Covan Holding ("Operating Agreement"), agree that the following action shall be deemed duly taken, by unanimous written consents of the Board and Members, on August 16, 2021, and entered into the minutes of Covan Holding.

<u>RESOLVED:</u>

      1.      That Daniel Schmitt's June 1, 2020 withdrawal from Covan Holding, pursuant to Section 7.10 of the Operating Agreement, is revered his 40,000 of Class A Units are reinstated, as accepted by the Board and ratified by a Majority-in-Interest of the Members;

      2.      The Board and Members agree to develop and execute any and all necessary documents to effectuate the above described actions and to develop and implement an amended and restated operating agreement.

The signatories, below, represent that each is duly authorized, below, to the actions described herein.

**THE REMAINING BOARD OF DIRECTORS OF COVAN HOLDING COMPANY, LLC**

_____
**ZENOVY WOWCZUK**

_____
**ADAM HANASKY**

**SECOND AMENDED & RESTATED OPERATING AGREEMENT**

**OF**

**COVAN HOLDING COMPANY, LLC**

**August 16, 2021**

**SECOND AMENDED & RESTATED OPERATING AGREEMENT**
**OF**
**COVAN HOLDING COMPANY, LLC**

**THIS SECOND AMENDED & RESTSTED OPERATING AGREEMENT OF COVAN HOLDING COMPANY, LLC** is entered into as of the 16th day of August 2021, by and among Zenovy Wowczuk and Adam Hanasky and any subsequent Member of the Company that will execute a joinder hereto.

**ARTICLE I**
**DEFINED TERMS**

The following defined terms used in this Agreement will have the meanings specified below:

1.1    "Act" means the West Virginia Limited Liability Company Act and any successor statute, as amended from time to time.

1.2    "Affiliate" means with respect to any Person: (a) the partners, members or stockholders of such Person, if such Person is an entity, and (b) any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person.

1.3    "Agreement" means this Operating Agreement, as it may be amended from time to time.

1.4    "Bankruptcy/Dissolution Event" with respect to a Person, means the commencement or occurrence of any of the following with respect to such Person:  (a) a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable Federal or state bankruptcy law or other similar law; (b) the appointment of (or a proceeding to appoint) a trustee or receiver of any property interest; (c) an attachment, execution or other judicial seizure of (or a proceeding to attach, execute or seize) a substantial property interest; (d) an assignment for the benefit of creditors; (e) the taking of, failure to take, or submission to any action indicating (after reasonable investigation) an inability to meet its financial obligations as they accrue; or (f) a dissolution or liquidation; provided, however, that the events described in Subsections (a), (b) or (c) shall not be included if the same are (i) involuntary and not at any time consented to, (ii) contested within thirty (30) days after commencement and thereafter diligently and continuously contested, and (iii) dismissed or set aside, as the case may be, within ninety (90) days after commencement.

1.5    "Board" has the meanings set forth in Section 6.1.

1.6    "Business" means the business of providing consulting services and other activities as the Board may determine from time to time.

1.7    "Business Day" means any day other than a Saturday, Sunday or Federal holiday.

1.8    "Capital Account" has the meaning set forth in Section 4.1(a).

1.9    "Capital Contribution" means the total amount of cash and other property contributed by a Member to the Company.  Any reference to the capital contribution by a Member shall include the

capital contribution made by a predecessor holder of the Units of such Member, provided, however, that in the event that such Member acquired only a portion of the Units held by such predecessor, any such reference shall include only that portion of the capital contribution of such predecessor as is determined by multiplying the number of Units acquired by such Member from such predecessor by the quotient of the total amount of the Capital Account of such predecessor at the time of the transfer of such Units to such Member divided by the total number of Units held by such Member at such time.

1.10   "CEO" has the meaning set forth in Section 6.4(c).

1.11   "Certificate" means the Certificate of Formation of the Company.

1.12   "Class A Units" has the meaning set forth in Section 3.1.

1.13   "Class A Members" means the Members holding Class A Units.

1.14   "Class B Units" has the meaning set forth in Section 3.2.

1.15   "Class B Members" means the Members holding Class B Units.

1.16   "Code" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of any succeeding law.

1.17   "Company" means the West Virginia limited liability company operated under this Agreement and formed on formed May 31, 2018.

1.18   "Competing Business" has the meaning set forth in Section 5.5(a).

1.19   "Director" has the meaning set forth in Section 6.1.

1.20   "Effective Date" means the date of the filing of the Certificate with the Secretary of State of the State of West Virginia.

1.21   "Estimated Tax Amount" with respect to any Member means the aggregate cumulative taxable income of the Company allocated to such Member pursuant to Section 4.3 hereof multiplied by 40%, provided, however, that in case of long-term capital gain allocated to a Member other than a corporation, such gain will be multiplied by the maximum cumulative Federal and applicable state rate, assuming that such state tax is deductible for Federal income tax purposes, applicable to long-term capital gain.

1.22   "Family Group" means, with respect to any natural Person, (a) such Person's spouse, (b) the lineal descendants of such Person, (c) corporations, limited liability companies or partnerships exclusively owned, managed and controlled by such Person, such Person's spouse or the lineal descendants of such Person, or (d) trusts that are exclusively for the benefit of such Person, such Person's spouse or the lineal descendants of such person (provided, that such trusts will at all times, during the lifetime of such Person, be under the complete management and control of such Person).

1.23   "Gross Asset Value" has the meaning set forth in Section 4.1(b).

1.24   "Income Tax Regulations" means the income tax regulations and temporary income tax regulations, respectively, promulgated under the Code from time to time.

1.25 "Incorporation Transaction" has the meaning set forth in Section 2.10.

1.26 "Indemnified Person" has the meaning set forth in Section 9.2.

1.27 "Liquidating Agent" means (a) a Person appointed by a Majority In Interest following the dissolution of the Company and accepted by such Person or (b) such other Person who will be appointed as a liquidating agent by any court of competent jurisdiction.

1.28 "Liquidation Value" has the meaning set forth in Section 3.3.

1.29 "Losses" has the meaning set forth in Section 4.3(a).

1.30 "Major Decisions" has the meaning set forth in Section 6.3(f).

1.31 "Majority In Interest" means Members holding more than fifty percent (50%) of the voting rights of the Members.

1.32 "Member" means the owner of a Membership Interest in the Company.

1.33 "Membership Interest" means a membership interest in the Company.

1.34 "Notice" has the meaning set forth in Section 4.10(a).

1.35 "Other Members" has the meaning set forth in Section 7.7(a).

1.36 "Percentage Interest" has the meaning set forth in Section 3.5.

1.37 "Permitted Transferees" has the meaning set forth in Section 7.2.

1.38 "Permitted Transfers" has the meaning set forth in Section 7.2.

1.39 "Person" means any natural person, partnership, limited partnership, trust, estate, association, limited liability company, corporation or any other entity.

1.40 "President" has the meanings set forth in Section 6.4(d).

1.41 "Proceeding" has the meaning set forth in Section 9.2.

1.42 "Profits" has the meaning set forth in Section 4.3(a).

1.43 "Purchaser" has the meaning set forth in Section 7.7(a).

1.44 "Regulatory Allocations" has the meaning set forth in Section 4.3(k).

1.45 "Remaining Units" has the meaning set forth in Section 7.8(b).

1.46 "Selling Members" has the meaning set forth in Section 7.7(a).

1.47 "Tax Matters Member" has the meaning set forth in Section 4.4.

1.48 "Transfer" has the meaning set forth in Section 7.1(a).

1.49     "Transferee" has the meaning set forth in Section 7.8(a).

1.50     "Transferor" has the meaning set forth in Section 7.8(a).

1.51     "Transfer Notice" has the meaning set forth in Section 7.8(a).

1.52     "Units" means a Membership Interest in the Company expressed in terms of measurement as a Unit (including, without limitation, Class A Units and Class B Units). The holder of a Unit issued by the Company will have the relative rights, duties and obligations as may be set forth in this Agreement. Except as provided in this Agreement, all Units will have the same relative rights, duties and obligations, as more fully described in this Agreement and will be treated as one class of Membership Interests. Each Class A Unit will provide its holder with one vote in the meetings and resolutions of the Members. Subject to any applicable law, and unless provided otherwise in the applicable Class B Units award agreement, the Class B Units will not entitle their holders any voting rights or right to participate in the meetings and resolutions (including written consents) of the Members. If the applicable Class B Units award agreement provides that the Class B Units will be voting, then each of such Class B Units will provide its holder, subject to the provisions of such agreement, a right to participate in the meetings and resolutions (including written consents) of the Members, and one vote in the meetings and resolutions (including written consents) of the Members.


## ARTICLE II
## ESTABLISHMENT AND TERMS OF THE COMPANY

2.1     Company Formation. The Members hereby ratify the formation of the limited liability company under the Act, on May 31, 2018.

2.2     Name. The name of the Company shall be "Covan Holding Company, LLC". The Company may have a different name or one or more fictitious names from time to time, or such other name or names as otherwise as established by the Board. The Board will file, or cause to be filed, any assumed name certificates and similar filings, and any amendments thereto, that are required by law or regulation or that it otherwise considers appropriate or advisable. The Members agree to cooperate with each other to allow the Company to obtain all necessary approvals of the Secretaries of State where such approvals are deemed necessary or appropriate and any other regulatory agencies, the approval of which is necessary to conduct the Business.

2.3     Principal Office and Place of Business. The principal office of the Company and the place at which the records will be maintained will be 3592 Collins Ferry Road, Suite 200, Morgantown, West Virginia 26505, or such other location as may hereafter be determined by the Board, from time to time.

2.4     Term. The term of the Company commenced on the Effective Date and will continue until dissolved and liquidated in accordance with the terms of this Agreement.

2.5     Purpose. The purposes of the Company will be (a) to engage in the Business, (b) to own, operate, finance, develop and dispose of such Business or any portion thereof, and (c) to make, enter into and perform any contracts and other undertakings, and to engage in any activities and transactions as may be ancillary to or necessary or advisable to carry out such Business. The business of the Company will also include (i) engaging in such other businesses or activities in which limited liability companies may

engage under the Act and the taking of such other actions as may be necessary, desirable or conducive to the accomplishment of the purposes of this Agreement and the Company, (ii) entering into, performing and carrying out of contracts, leases, rentals, exchanges of property or rights of any kind, and (iii) borrowing money and/or otherwise incurring debt which is necessary for or in connection with or incidental or convenient to the accomplishment of any of the purposes of the Company. The Company will have all powers that may be exercised by a limited liability company under the Act.

2.6    Certificate. The Directors have previously filed for recordation the Certificate, and will further file any and all amendments to the Certificate that are required by law to be filed and recorded hereafter for any reason, in such office or offices as are required under the laws of the State of West Virginia or under the laws of any state in which the Company is or should be qualified to do business as a foreign limited liability company. The Directors will also promptly register the Company under any assumed or fictitious name, statute or similar law, if any, in force and effect in each state in which the Company is qualified to do business. The Directors will do all other acts and things that may now or hereafter be required for the perfection and continuing maintenance of the Company as a limited liability company under the laws of the State of West Virginia and under the laws of any state in which the Company is or should be qualified to do business as a foreign limited liability company.

2.7    Qualification. The Company will exist under the laws of the State of West Virginia and, to the extent that the business of the Company is conducted in any jurisdiction other than West Virginia, under the laws of such other jurisdiction to the extent necessary or desirable to do business in such jurisdiction, as determined by the Board.

2.8    Governing Law. The Company was organized pursuant to the Act. Except as otherwise provided in this Agreement, all rights, liabilities, and obligations of the Members, both as between themselves and with respect to Persons not parties to this Agreement, will be as provided in the Act, and this Agreement will be construed in accordance with the provisions of the Act. To the extent that the rights or obligations of a Member are different by reason of any provision of this Agreement from what they would be in the absence of such provision, this Agreement will, to the extent permitted by the Act, control.

2.9    Property. All assets and property, whether real, personal or mixed, tangible or intangible, including contractual rights and leasehold interest, owned or possessed by the Company will be held or possessed in the name of the Company. All such assets, property, rights and interests will be deemed to be owned or possessed by the Company as an entity. No Member will have any separate ownership interest in such assets, property, rights or interests. Each Member's interest in the Company is personal property for all purposes.

2.10    Conversion into Corporation. Upon the approval of the Board of a plan to incorporate the Company as a corporation ("Incorporation Transaction"), each Member will take all actions necessary or desirable in connection with the consummation of the Incorporation Transaction, including executing any and all documents and agreements requested from time to time by the Board. The Incorporation Transaction may take any form as determined by the Board, including a merger or contribution of assets to a corporation. The Company will pay the organizational, legal, and accounting expenses and filing fees incurred in connection with the Incorporation Transaction.

## ARTICLE III
## CONTRIBUTIONS TO CAPITAL/UNITS

3.1     <u>Class A Units</u>.  Prior to or concurrently with the execution of this Agreement, Zenovy Wowczuk and Daniel Schmitt contributed and delivered to the Company the cash amount set forth in Exhibit A hereto.  In consideration for such Capital Contributions, the Company has issued to each of Zenovy Wowczuk and Daniel Schmitt, respectively, the number of Units of membership interests designated as "Units" as set forth in Exhibit A, and Zenovy Wowczuk and Daniel Schmitt were credited by the amount set forth in Exhibit A.  The Company may, from time to time, at the discretion of the Board, issue additional Units (or other Units as provided in Section 5.2).  Each Unit will provide its holder with one vote in the meetings and resolutions of the Members.

3.2     <u>Reserved.</u>

3.3     <u>Class B Units</u>.  The Company may, from time to time, at the discretion of the Board, issue membership interests, totaling a number of units not to exceed ten percent (10%) of the total Units when combined with the Class A Units, designated as "<u>Class B Units</u>" to its employees, consultants and other service providers, as an incentive to the recipients of such Units to focus on long-term Company performance.  Subject to any applicable law, and unless provided otherwise in the applicable Class B Units award agreement, the Class B Units will not entitle their holders any voting rights or right to participate in the meetings and resolutions of the Members.  If the applicable Class B Units award agreement provides that the Class B Units will be voting, then each of such Class B Units will provide its holder, subject to the provisions of such agreement, a right to participate in the meetings and resolutions (including written consents) of the Members, and one vote in the meetings and resolutions (including written consents) of the Members.

It is intended by the Members that all Class B Units granted in accordance with this Agreement be treated as "profits interests" for United States federal income tax purposes.  Accordingly, upon the initial grant of Class B Units and immediately following the adjustment of the Gross Asset Values of the Company assets and Capital Accounts required by Section 4.1(b)(ii)(D) hereof, the Liquidation Value of and initial Capital Account attributable to such Class B Units will be zero.  For purposes of this Agreement, the "<u>Liquidation Value</u>" attributable to Class B Units means the amount of cash that the recipient of the Class B Units would receive with respect to such newly-granted Class B Units if, immediately after the grant of such Class B Units, the Company sold all of its assets (including goodwill, going concern value, and any other intangibles associated with the Company's operations) for cash equal to fair market value of those assets (as determined by the Board consistently with the determination of Gross Asset Value) and liquidated in accordance with the provisions of Section 8.4 hereof.  A recipient of Class B Units that are subject to a substantial risk of forfeiture pursuant to Income Tax Regulations Section 1.83-3(c), as a condition to receipt of such Units, will agree to file a timely election (and provide the Company with a copy of such election) in accordance with the provisions of Code Section 83(b) with respect to such Class B Units.

3.4     <u>Additional Contributions</u>.  Except for the Capital Contributions described in Section 3.1 above, no Member will be required to contribute capital to the Company.  However, a Member may make additional Capital Contributions to the Company if approved by the Board.

3.5     <u>Percentage Interests</u>.  The percentage ownership interest of each Member in the Company (the "<u>Percentage Interests</u>") shall be equal to the total number of Units held by such Member divided by the total number of Units held by all Members.  The Company shall maintain a correct record of all Members, their Unit ownership and their Percentages Interests.

3.6     Return of Capital.  Except as provided in this Agreement, no Member will receive a return of or reduction on its Capital Contribution and no Member will have a priority over any other Member either as to a return of its Capital Contribution or distributions of cash made by the Company. No interest will be paid to any Member on such Member's Capital Account.

3.7     Borrowing.  If at any time and from time to time the Company has need of additional funds in excess of any reserves to carry out the business of the Company or to pay any of its obligations, expenses, costs, liabilities or expenditures (including operating deficits), the Company may borrow such funds, with interest payable at rates then prevailing for loans of the same nature, from commercial banks or other financial institutions or other Persons.


# ARTICLE IV
## TAX/ACCOUNTING/DISTRIBUTIONS

4.1     Capital Accounts

(a)     A single capital account ("Capital Account") will be maintained for each Member in accordance with the capital account rules of the Code and the Income Tax Regulations promulgated thereunder.  Each Class A Member's initial Capital Account balance will be the amount of such Member's initial Capital Contribution.  Each Class B Member's initial Capital Account balance with respect to his, her or its newly-issued Class B Units will be equal to zero.  Thereafter, a Member's Capital Account will be credited with (i) the Gross Asset Value of any property subsequently contributed to the capital of the Company by such Member; (ii) such Member's share of Profits as provided below; and (iii) such other amounts as may be required for the Capital Account to be considered to be determined and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv) (including Treasury Regulations Section 1.704-1(b)(2)(iv)(g)) or any successor section of similar import.  A Member's Capital Account will be debited with (A) such Member's share of Losses as provided below, (B) the amount of cash and the Gross Asset Value of Company assets distributed to such Member, and (C) such other amounts as may be required for the Capital Account to be considered to be determined and maintained in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv) (including Treasury Regulations Section 1.704-1(b)(2)(iv)(g)) or any successor section of similar import.

(b)     The term "Gross Asset Value" with respect to any asset means the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company is the fair market value of such asset, as determined in good faith by the Board.

(ii)     The Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined in good faith by the Board in connection with the following events:

(A)     the acquisition of additional Units or other evidence of Membership Interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution;

(B)     the distribution by the Company to a Member of more than a *de minimis* amount of Company property (including money), as consideration for Units or any other interest in the Company;

(C)     the liquidation of the Company for Federal income tax purposes within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and

(D)     in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a member capacity, or by a new Member acting in a partner capacity in anticipation of being a Member; provided that an adjustment described in clauses (A), (B), and (D) of this paragraph will be made only if the Board reasonably determine that such adjustment is necessary to reflect the relative economic interests of the Members in the Company or, with respect to clause (D) hereof, to properly qualify an issuance of a Class B Unit as a "profits interest" as described in Section 3.3 hereof;

(iii)     The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of such asset on the date of distribution.

(iv)     The Gross Asset Value of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and Section 4.1(c) hereof; provided, however, that Gross Asset Values will not be adjusted pursuant to this Subsection (iv) to the extent the Tax Matters Member determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

(v)     If the Gross Asset Value of an asset has been determined pursuant to Subsections (i), (ii) or (iv) hereof, such Gross Asset Value will thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(c)     If the Gross Asset Values of Company assets are adjusted pursuant to Section 4.1(b), the Capital Accounts of all Members will be adjusted simultaneously to reflect the aggregate net adjustment as if the Company recognized Profits or Losses equal to the amount of such aggregate net adjustment.

4.2     Distributions

(a)     Subject to the provisions of this Section 4.2, cash and property distributions from the Company to the Members will be made at such times and in such amounts as determined by the Board, from time to time, in the Board's sole discretion.

(b)     The Board may cause the Company to distribute securities and other non-cash items to the Members, at such times and in such amounts as it may, in its sole and absolute discretion, deem appropriate; provided, however, that no distribution of securities or other non-cash items will be made to any Member if such distribution would cause such Member to be in violation of any applicable law.  The fair market value of such distributions will be determined by the Board in good faith. Immediately prior to such distributions, the Capital Accounts of the Members will be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in such property (to the

- 8 -

extent not previously so reflected) would be allocated among the Members had there been a taxable disposition of such property at its fair market value on the date of distribution.

(c)     Subject to Section 4.2(f) hereof, distributions by the Company will be made as follows:

(i)     First, 100% to all Members, in proportion to their unpaid Estimated Tax Amounts, until each Member has received cumulative distributions pursuant to this clause (i) equal to such Member's cumulative Estimated Tax Amount;

(ii)     Thereafter, to all Members in accordance with their Percentage Interests.

(d)     No distribution will be made that, in the Board's opinion, would have the effect of rendering the Company insolvent or, in the discretion of the Board, would have the effect of making it impossible to carry out the business of the Company.

(e)     Except as expressly provided in the Agreement or otherwise agreed by the Members, no Member will be entitled to withdraw capital or to receive distributions of or against capital. Each Member will look solely to the assets of the Company for return of such Member's Capital Contribution to the Company.

(f)     Notwithstanding anything to the contrary in this Section 4.2, the Board will use its best efforts to ensure that no distributions are made to any Member pursuant to Section 4.2 which would cause or increase a deficit Capital Account with respect to such Member (after proper adjustment is made to such Capital Accounts to reflect the anticipated allocations of Profits and Losses with respect to the operations of the Company). Notwithstanding the foregoing, the Board will make a distribution to a Member pursuant to Section 4.2(c)(i) without regard to the limitation contained in this Section 4.2(f).

4.3     Profits and Losses

(a)     Profits and Losses will be computed in the same manner as the Company reports its income for Federal income tax purposes, except that (i) for purposes of gain, loss, depreciation and otherwise, property will be considered to have a book value equal to its Gross Asset Value; (ii) income of the Company exempt from federal income tax and expenses not deductible for federal income tax purposes under the Code will be included in the computation; (iii) any expenditure by the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Income Tax Regulations promulgated under Section 704 of the Code, and not otherwise taken into account in computing Profits or Losses, will be subtracted from such taxable income or loss ("Profits" or "Losses"); and (iv) in the event the Gross Asset Value of any Company asset is adjusted pursuant to Sections 4.1(b)(ii) or 4.1(b)(iii) of the definition of "Gross Asset Value," the amount of such adjustment will be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and will be taken into account for purposes of computing Profits or Losses. The principles of Income Tax Regulations Section 1.704-1(b)(4)(i) will be applied when necessary to prevent duplication or omission of Capital Account adjustments.

(b)     Except as otherwise provided in this Agreement, and after giving effect to the special allocations set forth in Sections 4.3(f), (g), (h) and (i) hereof, or otherwise required under the Code or the Income Tax Regulations, the Company's Profits and Losses will be allocated to the Members in the following order and priority:

(i)        Profits

(A)        First, to the Members, *pro rata*, in proportion to their shares of cumulative Losses allocated to them in prior allocation periods pursuant to Section 3(b)(ii)(C) that were not previously offset with allocations of Profits pursuant to this Section 3(b)(i)(A) until the cumulative Profits allocated pursuant to this Section 3(b)(i)(A) equal the cumulative Losses allocated pursuant to Section 3(b)(ii)(C).

(B)        Second, to the Members, pro rata, in proportion to their shares of cumulative Losses allocated to them in prior allocation periods pursuant to Section 3(b)(ii)(B) that were not previously offset with allocations of Profits pursuant to this Section 3(b)(i)(B) until the cumulative Profits allocated pursuant to this Section 3(b)(i)(B) equals the cumulative Losses allocated pursuant to Section 3(b)(ii)(B).

(C)        Thereafter, to all Members in accordance with their Percentage Interests.

(ii)        Losses

(A)        First, to the Members, *pro rata*, in proportion to their shares of cumulative Profits allocated to them in prior allocation periods pursuant to Section 3(b)(i)(C) that were not previously offset with allocations of Losses pursuant to this Section 3(b)(ii)(A) until the cumulative Losses allocated pursuant to this Section 3(b)(ii)(A) equal the cumulative Profits allocated pursuant to Section 3(b)(i)(C).

(B)        Second, to the Members, in proportion to and to the extent of their respective positive Capital Accounts.

(C)        Thereafter, to all Members in accordance with their Percentage Interests.

(c)        <u>Loss Limitation</u>. Losses allocated to any Member pursuant to Section 4.3(b) will not exceed the maximum amount of Losses that can be allocated to such Member without causing or increasing a deficit balance in such Member's Capital Account. In the event that some but not all of the Members would have deficit balances in their Capital Accounts as a consequence of allocations of Losses pursuant to Section 4.3(b), the limitation set forth in this Section 4.3(c) will be applied on a Member-by-Member basis, and Losses not allocable to any Member as a result of this limitation will be allocated to the other Members in proportion to the positive balances of such Members' Capital Accounts so as to allocate the maximum amount of Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). Notwithstanding any other provision of this Agreement to the contrary, if any Losses are allocated pursuant to this Section 4.3(c), those Losses will be recovered, on a *pari passu* basis, from the next available Profits of the Company.

(d)        <u>Tax Allocations</u>

(i)        Except as provided below, or as otherwise required by the Code or regulations promulgated thereunder, Company income, gain, loss, deduction, credit and other items, as computed for Federal income tax purposes, will be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Sections 4.3(b), 4.3(c), 4.3(e), 4.3(f), 4.3(g), 4.3(h) and 4.3(i).

- 10 -

       (ii)      In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for Federal income tax purposes and the initial Gross Asset Value of the property (computed in accordance with subparagraph (i) of the definition of "Gross Asset Value"). If the Gross Asset Value of any Company asset is adjusted under subparagraph (ii) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss, and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Treasury Regulations. In making the allocations pursuant to this Section 4.3(d), the Board will elect to apply any method permitted by Treasury Regulations Section 1.704-3. Any other elections or decisions relating to allocations under this Section 4.3(d) will be made in any manner that the Board reasonably determines reflects the purpose and intention of this Agreement. Allocations under this Section 4.3(d) are solely for purposes of Federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Agreement.

       (e)      If any Membership Interest is transferred during a fiscal year, the net Profit or Loss attributable to such Membership Interest for such period will be allocated between the transferor and transferee based on the ratio of the number of days in such period before and after such transfer, except as otherwise provided in any document governing such transfer.

       (f)      To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section l.704-l(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

       (g)      In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(d)(4), 1.704-l(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) which results in such Member having a deficit Capital Account balance, or otherwise has a deficit Capital Account balance, which exceeds the sum of (i) the amount of such deficit the Member is obligated to restore, and (ii) the amount of such deficit the Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), such Member will be specially allocated items of Company income and gain in the amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in such Member's Capital Account as quickly as possible. Any special allocation made under this Section 4.3(g) will be taken into account for purposes of determining subsequent allocations of income and Losses, so that the total allocations will, to the extent possible, equal the allocations which would have been made if this Section 4.3(g) had not been previously applied.

       (h)      Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, and notwithstanding any other provision of this Article IV, if there is a net decrease in partnership minimum gain (as such term is defined in Treasury Regulations Section 1.704-2(d)) during any company taxable year, each Member will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to that Member's share of the net decrease in partnership minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated will be determined in accordance with Section 1.704-2(f)(6) and 1.704-

1(j)(2) of the Treasury Regulations.  This Section 4.3(h) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and will be interpreted consistently therewith.

(i)     Nonrecourse deductions (as such term is defined in Treasury Regulations Section 1.704-2(b)), if any, for any taxable year or other period will be allocated between the Members in accordance with the relative percentage of the number of Units held by such Member compared to the total number of Units outstanding.  Any partner nonrecourse deductions (as such term is defined in Treasury Regulations Section 1.704-2(i)) for any taxable year or other period will be specially allocated to the Member who bears the risk of loss with respect to the partner nonrecourse debt (as such term is defined in Treasury Regulations Section 1.704-2(b)(4)) to which such partner nonrecourse deductions are attributable, in accordance with Treasury Regulations Section 1.704-2(i).

(j)     No Member will have any obligation to restore, reimburse, pay or otherwise contribute cash or property to the Company because of such Member's deficit Capital Account (if any).

(k)     The allocations set forth in Sections 4.3(c), 4.3(f), 4.3(g), 4.3(h), and 4.3(i) (the "Regulatory Allocations") are intended to comply with certain requirements of the Income Tax Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.3(k).  Therefore, notwithstanding any other provision of this Article IV (other than the Regulatory Allocations), the Board will make such offsetting allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 4.3(b) hereof.  In exercising its discretion under this Section 4.3(k), the Board will take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made hereunder.

4.4     Tax Matters Member.  The tax matters member of the Company (the "Tax Matters Member") will be through the efforts of Adam Hanasky, which may be changed from time to time by the Board.  The Tax Matters Member will have the responsibility of a tax matter partner specified under the Code.  The Tax Matters Member will promptly notify all Members of any action taken by the Service relating to an audit or review of the Company's Federal income tax filing and will keep all Members informed of the status of any such proceedings.  Each Member will have the right to participate in such proceedings at such Member's expense.  Subject to the pre-approval of the Board, the Company will reimburse the Tax Matters Member for all expenses reasonably incurred in connection with the Tax Matters Member's duties hereunder.

4.5     Books and Records.  The Board will keep, or cause to be kept, true, exact and complete books of account of the Company's affairs, in which will be entered fully and accurately minutes of meetings of the Board and results of each transaction of the Company and of each entity which it controls.  The books of account will be kept on a basis as determined by the Board.  Such books of account, together with all correspondence, papers and other documents, will be kept at the principal office of the Company and will be, at all reasonable times, open to the examination of any of the Members or their duly authorized representatives.  Except as otherwise provided herein, all financial books and records of the Company and of each entity which it controls will be kept and all financial statements furnished to the Members upon request.

4.6     <u>Tax and Financial Reports</u>

(a)     Within ninety (90) days after the end of each fiscal year, if practicable, each Member will be provided with an information letter with respect to such Member's distributive share of income, gain, deduction, Losses and credits, as the case may be, for income tax reporting purposes for the previous fiscal year, together with any other information concerning the Company necessary for the preparation of a Member's income tax return, including Form K-1 for the Company.  Additionally, within ninety (90) days after the end of the fiscal year, if practicable, each Member will receive their respective Estimated Tax Amounts in accordance with Section 4.2(c)(i).

(b)     The Board will cause to be prepared all Federal, state, and local tax returns of the Company for each year for which such returns are required to be filed.  The Board will promptly notify all other Members of any Company audits by the Internal Revenue Service or any state or local taxing authority.

4.7     <u>Company Accountant</u>.  The Company's accountant will be such firm of independent certified public accountants as the Board may determine from time to time.

4.8     <u>Bank Accounts</u>.  The Company will maintain bank accounts in such banks or institutions as the Board from time to time will select, and such accounts will be drawn upon by check signed by such Person or Persons, and in such manner, as may be designated by the Board.  Initially and until further action from the Board, Adam Hanasky and Zenovy S. Wowczuk shall be the designated signatories for bank accounts and have authority to open such bank accounts. All monies of the Company will be deposited in the bank or other financial institution account or accounts of the Company.  Company funds will not be commingled with those of any other Person.

4.9     <u>Tax Elections</u>.  All tax elections available to the Company for federal, state or local tax purposes will be made by the Tax Matters Member.  Notwithstanding the foregoing, except for an Incorporation Transaction, the Tax Matters Member will not, without the consent of a Majority In Interest, cause the Company to be classified as an association taxable as a corporation.

4.10    <u>Incentive Units / Non-Compensatory Options</u>

(a)     <u>Treatment of Units / Amendments</u>.  The Members agree to apply the provisions of Notice 2005-43 (the "<u>Notice</u>") and current proposed Treasury Regulations related to compensatory partnership interests in determining the tax consequences with respect to the grant and forfeiture of Class B Units and any other Units issued to a service provider in exchange for services provided to the Company (including, without limitation, making forfeiture allocations as described in proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) upon forfeiture of all or any portion of a non-vested Unit). Upon issuance of final guidance by the Service relating to the federal income tax treatment of the issuance of an interest to a service provider by the Company, each Member authorizes the Board, in its sole discretion, to amend this Agreement to the extent necessary to comply with such final guidance; <u>provided</u> that such amendment is not materially adverse to the rights of any Member (as compared with the after tax consequences that would result upon application of the Notice and proposed Treasury Regulations).  Until such final guidance is issued, each Member and the Company agree to treat the recipient of a Unit that is characterized upon issuance by the Company as a "profits interest" for U.S. federal income tax purposes as the owner of such Unit from the date of grant and will not take any position inconsistent with the characterization of such Unit as a profits interest within the meaning of Rev. Proc. 93-27 and Rev. Proc. 2001-43.

(b)    Safe Harbor.  By executing this Agreement, each Member authorizes and directs the Tax Matters Member to cause the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in the Notice (or any similar guidance that is issued in final form by the Internal Revenue Service) apply to any membership interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company.  Execution of such Safe Harbor election by the Tax Matters Member constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the Notice.  The Company and each Member agree to comply with all requirements of the Safe Harbor described in the Notice (or any similar guidance that is issued in final form by the Internal Revenue Service), including, without limitation, the requirement that each Member will prepare and file all federal income tax returns reporting the income tax effects of each Safe Harbor Interest issued by the Company in a manner consistent with the requirements of the Notice (or similar final guidance).  A Member's obligations to comply with the requirements of this Section 4.10(b) will survive such Member's ceasing to be a Member and/or the termination, dissolution, liquidation and winding up of the Company.

(c)    Amendment Permitted.  Upon issuance of final guidance by the Internal Revenue Service relating to the federal income tax treatment of the issuance of a membership interest to a service provider by the Company, each Member authorizes the Board, in its sole discretion, to amend this Agreement to the extent necessary to comply with such final guidance.

(d)    Non-Compensatory Option.  For purposes of this Agreement, with respect to any "noncompensatory option" (as defined in proposed Treasury Regulation Section 1.721-2(d), the Company will apply rules similar to those set forth in current proposed Treasury Regulations relating to such noncompensatory options, including, without limitation, proposed Treasury Regulations Section 1.704-1(b)(2)(iv)(s) or any successor temporary or final Treasury Regulation, including the requirement of corrective allocations set forth in proposed Treasury Regulation Section 1.704-1(b)(4)(x).  Upon issuance of final guidance by the Internal Revenue Service relating to the federal income tax treatment of the issuance and exercise of a noncompensatory option, each Member authorizes the Board, in its sole discretion, to amend this Agreement to the extent necessary to comply with such final guidance.

## ARTICLE V
## MEMBERS

5.1    The Current Members.  The current Members of the Company are Zenovy Wowczuk and Adam Hanasky, who are deemed to either continue to be or to become a new Member of the Company contemporaneously with the execution by such Member of this Agreement.

5.2    Additional Members.  Additional Persons may be admitted to the Company as Members, and Units may be issued to those Persons and to existing Members, at any time and from time to time, upon the approval of the Board and as determined by the Board.  The Board shall have the authority to determine the rights, terms and conditions of any such additional Units (including the economic governance and management rights).  Such additional Units may have different rights, powers and duties, including preferences, rights, restrictions and voting rights hereunder, and may be subordinate to, *pari passu* to, or senior to existing series or classes of Units.

5.3    Equity Plans.  The Board is authorized to adopt one or more employee ownership incentive plan and/or other types of bonus or compensation plans upon terms and conditions determined

by the Board.  The issuance of any Units under a Company incentive plan may require the employee to become bound by all or some of the provisions of this Agreement, as determined by the Board.

      5.4    <u>Member Meetings</u>.  Meetings of the Members may be called by (a) the Board, (b) the CEO, (c) the Chairman of the Board, or (d) one or more Members holding, in the aggregate, Percentage Interests of at least 25%, upon no less than three Business Days notice in writing to all Members.  Any notice required to be given to any Member under the Act or this Agreement may be waived in writing by the Member entitled to such notice (whether before or after the meeting).  A Member's attendance at a meeting will also constitute a waiver of any required notice to such Member of the meeting unless the Member at the beginning of the meeting objects to holding the meeting or transacting particular business at the meeting.  At any meeting, each Member will have the number of votes that corresponds to its Units.  Members may participate in Company meetings by means of conference telephone calls in which all Members participating in the meeting can hear each other.  Each Member may vote in person or by telephone or authorize another Member or Members to act for it by proxy.  Proxies will be valid only if in writing.  All meetings of the Members will be held at the principal office of the Company or at such other place as determined by the Board.  At any Company meeting, the presence in person or by telephone or proxy of the Members holding a Majority In Interest will constitute a quorum.  Except as otherwise provided herein, the business of the Company presented at any meeting will be decided by a vote of the Members holding a Majority In Interest.  Any action required or permitted to be taken at a meeting of the Members or any other actions which may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, will be signed by Members holding the requisite number of Units required to approve the action.

      5.5    <u>Non-Compete and Non-Solicitation</u>.

      (a)    <u>Non-Compete</u>.  During the Restriction Period, each Member shall not, directly or indirectly, unless through an Affiliate under majority control by the Current Members (i) engage in or own a business that engages in the Business (a "<u>Competing Business</u>") or (ii) manage, operate, finance, invest in, control, advise, render services to or guarantee the obligations of any Competing Business.  Solely for purposes of this Section 5.5, the definition of "Business" in Section 1.7 hereof shall be deemed not to be amended or changed, notwithstanding an amendment or change thereto in accordance with Section 10.7 hereof, with respect to a Member unless and until such Member has consented to such amendment or change.  The "<u>Restriction Period</u>" with respect to each Member shall mean the period of time during which, and for one year after, such Member and, such Member's Permitted Transferees, Affiliates and members of such Member's Family Group, collectively, hold, directly or indirectly, at least 10% of the Percentage Interests.

      (b)    <u>Non-Solicitation</u>.  Except as otherwise provided, during the Restriction Period, a Member shall not, directly or indirectly:

      (i)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, officer or other business relation of the Company to cease doing business with the Company in the Business or in any way interfere with its relationship with the Company in the Business; or

      (ii)    cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, officer or other business relation of the Company to deal with any third party to the extent it relates to a Competing Business or in any way interfere with its relationship with the Company in the Business.

(c)     Permissible Exception.  Notwithstanding anything in this Section 5.5 to the contrary, each of the Members and their respective Affiliates may purchase or otherwise acquire up to 3% of any class of publicly-traded securities of any Competing Business.

(d)     Independent Covenants.  The restrictive covenants contained in this Section 5.5 are covenants independent of any other provision of this Agreement and the existence of any claim that the Company and a Member may allege against the other, whether based on this Agreement or otherwise, shall not prevent the enforcement of this covenant.  The Members agree that their remedies at law for any breach or threat of breach of the provisions of this Section 5.5 will be inadequate, and that the Company shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Section 5.5 and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which each party may be entitled at law or equity.  In the event of litigation regarding the covenant not to compete, the prevailing party in such litigation shall, in addition to any other remedies the prevailing party may obtain in such litigation, be entitled to recover from the other party its reasonable legal fees and out of pocket costs incurred by such party in enforcing or defending its rights hereunder.

(e)     Severability.  As indicated in Section 10.8, the provisions contained in this Section 5.5 restricting the competition activities of the Members shall be deemed divisible, so that if any provision contained in this Section 5.5 is determined to be invalid or unenforceable under legal or equity principles, that provision shall be deemed modified so as to be valid and enforceable to the full extent lawfully permitted.


# ARTICLE VI
## MANAGEMENT AND BOARD

6.1     Board.  The business and affairs of the Company will be directed by the Company's board (the "Board").  The Board will consist of members (referred to in this Agreement as "Directors").  The number of members of the Board may be increased or decreased from time to time by the Board.  The current members of the Board will be Adam Hanasky and Zenovy Wowczuk.  The Chairman of the Board will be Zenovy Wowczuk.

6.2     Terms of Board

(a)     Appointment.  All Directors will be appointed, removed or replaced by a Majority In Interest.

(b)     Term of Directors.  Each Director will serve until the expiration of the term for which such Director was selected and until a successor has been selected or until such Director's earlier death, resignation or removal.

(c)     Resignation.  Any Director may resign at any time upon written notice to the Company.  The resignation will be effective upon receipt thereof by the Company or at such subsequent time as will be specified in the notice of resignation.

(d)     Removal by the Members.  Directors may be removed from office without assigning any cause by a Majority In Interest.

(e)    <u>Authority of Directors</u>.  No Director acting alone and without the authority of the Board will have the authority to bind the Company.

6.3    <u>Board Procedures</u>

(a)    <u>Votes</u>.  Each Director will have one vote in the meetings of the Board.

(b)    <u>Quorum; Manner of Acting</u>.  A quorum of the Board will be Directors having a majority of the votes of Directors.  Except as otherwise provided in Section 6.3(e) below, all decisions by the Board will be made at a meeting at which a quorum is present.  The act of the Directors having a majority votes of Directors present at a meeting with a quorum will be the act of the Board.  The Board will meet from time to time as determined by the Board, and as often as necessary or desirable to carry its management functions.  Meetings will be held at the Company's principal office located in Morgantown, West Virginia, unless otherwise agreed.  A written record of each meeting of the Board and all decisions made by it will be made by the Secretary or other appropriate officer and kept in the records of the Company.

(c)    <u>Special Meetings</u>.  Special meetings of the Board may be called by or at the request of any Director with at least two (2) Business Days' notice to all Directors and will be held at the principal office of the Company, unless agreed otherwise, located in Morgantown, West Virginia, during normal business hours.

(d)    <u>Participation</u>.  Members of the Board may participate in any meetings of the Board telephonically or through other similar communications equipment (including electronically).  Participation in the meetings pursuant to the preceding sentence will constitute presence in person at such meeting for all purposes of this Agreement.  Notice of any such special meeting of the Board will be given to all members no fewer than two (2) Business Days prior to the date of such meeting.  A waiver of notice of a meeting signed by the Director entitled to notice, whether before or after the meeting, will be deemed equivalent to the giving of notice.  The attendance of a Director at a meeting of the Board (either in person or telephonically) will constitute a waiver of notice of such meeting, except where a Director attends for the express purpose of objecting to the transaction of any business because the meeting is not properly called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting of the Board need be specified in the notice or waiver of notice of such meeting.

(e)    <u>Action In Lieu of Meeting</u>.  Any action required or permitted to be taken at a meeting of the Board or any other actions which may be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken, will be signed by all members of the Board, which will have the same effect as an act of the Board.

(f)    <u>Major Decisions</u>.  The Board will be responsible for all Major Decisions.  For purposes of this Agreement, "<u>Major Decisions</u>" means all major decisions regarding the business of the Company, including, without limitation, the following:

(A)    Approval of the Company's budget and business plan;

(B)    Making any expenditure or incurring any obligation by or on behalf of the Company that varies by more than 5% from the then applicable budget and business plan.

(C)    Institution of any legal proceeding in the name of the Company where the amount in controversy is more than Twenty-Five Thousand Dollars ($25,000), settlement of

any legal or administrative proceeding against the Company or any Affiliate thereof where the amount in controversy (or the risk of loss to the Company of future revenues) is more than Twenty-Five Thousand Dollars ($25,000) and confession of any judgment against the Company where the amount of controversy is more than Twenty-Five Thousand Dollars ($25,000);

(D)     The admission of additional Members to the Company and the terms and conditions thereof;

(E)     The acceptance of any investment in the Company (in equity, debt, convertible debt or otherwise) and the terms thereof from any existing Member or third party;

(F)     Filing, commencing or otherwise initiating a Bankruptcy/Dissolution Event with respect to the Company;

(G)     The designation and removal of officers of the Company pursuant to Section 6.4 below and the hiring and laying off employees;

(H)     Except as contemplated by any then applicable budget and business plan, borrowing on behalf of the Company, or pledging, mortgaging or encumbering, or granting a security interest in, any Company property; or

(I)     Entering into any agreement, contract, understanding or arrangement with any Member or any Affiliate thereof or any other agreement, contract, understanding or arrangement involving a commitment of $25,000 or more.

6.4     Officers

(a)     General.  The Company may have the officers described in, and who will have the authority and duties prescribed by, this Section 6.4.  Any two or more offices may be simultaneously held by the same person, but no person may act in more than one capacity where action of two or more officers is required.

(b)     Appointment, Term, Compensation and Removal.  The officers will be appointed (if at all) from time to time by the Board.  The officers will serve, subject to the provisions of this Agreement, until their respective successors are duly appointed and qualified.  Any officer may be removed by the Board at any time for or without cause; but such removal will not itself affect the contractual rights, if any, of the officer so removed.  Designation of an officer will not of itself create contract rights.  The compensation of all officers will be fixed by the Board or as prescribed by this Agreement.

(c)     Chief Executive Officer.  The chief executive officer ("CEO"), if one is designated by the Board, will be the chief executive officer of the Company and, subject to the provisions of this Agreement and the direction and control of the Board, will supervise and control the management of the Company, and take such actions as may be necessary or appropriate to execute the policies, directives and requirements of the Board.  The CEO will report to the Board.  The CEO of the Company will be Zenovy Wowczuk.

(d)     President.  The President ("President"), if one is designated by the Board, will be, subject to the provisions of this Agreement, the CEO or the chief operating officer of the Company, and

will have such duties and responsibilities as shall be designated by the CEO from time to time. The President will report to the CEO. The President as of the Company will be Zenovy Wowczuk.

      (e)    <u>Other Officers</u>. The Board may appoint such other officers with such titles, powers, duties, compensation and other terms as they may determine to be necessary or appropriate, including without limitations, a treasurer, a secretary, and vice president(s). The secretary and the treasurer of the Company will be Adam Hanasky, who will also serve as a Vice President of the Company.

      (f)    <u>Reimbursement of Expenses</u>. The Company will reimburse each officer for all reasonable out-of-pocket expenses properly incurred by such officer in connection with the discharge of that officer's obligations in accordance with this Agreement or otherwise properly incurred on behalf of the Company.

    6.5    <u>Compensation; Affiliate Transactions</u>

      (a)    <u>Compensation</u>. Except as otherwise approved by the Board, no Member or any partner, member, shareholder, officer, director, employee, agent or representative of any Member, will receive any salary or other payment for services rendered pursuant to this Agreement.

      (b)    <u>Affiliate Transactions</u>. Notwithstanding anything to the contrary contained herein, any decision by the Company to enter into, or terminate or exercise any right or remedy under, any contract or arrangement between the Company and any Member or an Affiliate of any Member will be at arm's length, on commercially reasonable terms, and will require the approval of the Board.

    6.6    <u>Reliance on Information</u>. Any Member or any director, trustee or officer of any Member serving on behalf of the Company, and any Director, officer or employee of the Company in the performance of his, her or its duties, is entitled to rely in good faith on information, opinions, reports or statements presented to the Company by any of its other Directors, Members, officers, employees or committees of the Company, or by any other Person, as to matters the Members or Directors reasonably believe are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits or Losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

    6.7    <u>Other Activities</u>. The Members, Directors, and officers will devote such time, effort and skill to the business and affairs of the Company as may be reasonable and necessary or appropriate for the welfare and success of the Company. Additionally, unless required by a separate agreement, the Members, Directors, and future members, managers, directors, officers, agents and employees, and present and future affiliated Persons with respect to any of the foregoing, may engage in or possess interests in other businesses or ventures of any nature and description, independently or with others (subject to any contractual obligation between such Members, Directors and officers, as applicable, to the Company), and except as otherwise provided herein neither the Company nor any other Member will have any right by virtue of this Agreement in such independent ventures.

**ARTICLE VII**
**TRANSFER OF MEMBERSHIP INTERESTS/ WITHDRAWAL**

7.1     Restrictions on Transfer

(a)     Prohibitions on Transfers.  No sale, exchange, delivery, assignment, transfer, disposal, encumbrance, pledge or hypothecation, whether voluntary, involuntary, by operation of law, or resulting from death, disability or otherwise (a "Transfer") will be made by a Member of the Units held by such Member without the prior approval of the Board (which approval may be granted, denied or withheld in the Board sole and exclusive discretion, with the exception of Permitted Transfers and other Transfers permitted hereunder that comply with the requirements of this Agreement, for which approval of the Board will not be unreasonably denied or withheld, and then only in compliance with this Agreement).  For purposes of this Agreement, an involuntary Transfer will include the entry of a final order of a court that is not subject to appeal, directing transfer of a Membership Interest.

(b)     Restrictions.  The ownership and transferability of Units of the Company are substantially restricted.  Neither record title nor beneficial ownership of a Unit may be Transferred or encumbered except as otherwise set forth in this Agreement.  An unauthorized Transfer of Units could create a substantial hardship to the Company.  The restrictions upon ownership and Transfer under this Article VII are not intended as a penalty, but as a method to protect and preserve the Company's capital and its financial ability to continue.  Therefore, the Members agree that no Member will Transfer, or permit to be Transferred, Units, whether now or hereafter acquired, except in accordance with the terms of this Agreement.

(c)     Effect of Wrongful Transfers.  Any attempted Transfer not in accordance with the terms of this Agreement will be null and void and will not be reflected on the Company's books; provided, however, that, if the Company is required to recognize a Transfer that is not otherwise permitted (or the Company, in its discretion, elects to recognize a Transfer that is not a permitted Transfer), then the Units so Transferred will be strictly limited to the transferor's economic rights to distributions and allocations of income, gain, loss, deduction or credit as provided by this Agreement with respect to such Transferred Units, which distributions and allocations may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such interest may have to the Company.

(d)     Acknowledgement.  Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein will be specifically enforceable.

7.2     Permitted Transfers.  The restrictions set forth in Section 7.1 above, and the obligations below (other than Section 7.6), will not apply to the following Transfers of Units (collectively, "Permitted Transfers"):  (a) Transfers between the Members, or (b) from a Member to such Member's Family Group (collectively, "Permitted Transferees").

7.3     Effect of Permitted Transferees.  Any such Permitted Transferee will receive and hold the Units or Membership Interests being Transferred subject to the terms of this Agreement and to the obligations of the transferor.

7.4     Section 754 Election.  In connection with any Permitted Transfer, the Company may, in its discretion, make the election to adjust the tax basis of Company assets pursuant to Code Section 754

and in the manner provided in Sections 734(b) and 743(b) of the Code or comparable provisions of state or local law.

7.5 Effect of Assignment; Documents. In the event of any Transfer of Units permitted hereunder, the Company will not be terminated but instead will continue as before, with, however, the addition or substitution of such new Member. No such Transfer will relieve the assignor from any of its obligations under this Agreement without the prior written consent of the other Members (which consent will not be unreasonably withheld as to obligations assumed by an assignee provided, among other matters, the assignment is permitted hereunder and the other Members are reasonably satisfied that the assignee is sufficiently creditworthy to timely satisfy such obligations). Notwithstanding the foregoing, as a condition to any sale or assignment by a Member, the transferee or assignee must execute and deliver to the other Members an assumption (in form reasonably satisfactory to the other Members) of all the obligations of the assignee under this Agreement arising from and after the date of such assignment. Any Transfer made in violation of this Article will be void.

7.6 Restrictions Applicable to All Transfers. All Transfers are subject to the following:

(a) Prior to transferring any Units to any Person, the transferring Member will cause the prospective transferee to execute and deliver to the Company a counterpart of this Agreement and such other documents and agreements requested by the Company.

(b) The Units have not been registered under the Securities Act of 1933, as amended, or any applicable state securities laws, and may not be Transferred in the absence of an effective registration statement under such laws except pursuant to an exemption from such laws. If Units are being transferred pursuant to such an exemption, then the Board may, at its option, require the transferor to obtain an opinion of the transferor's counsel as to the availability of such exemption, which opinion and counsel will be reasonably satisfactory to the Company.

7.7 Bring-Along/Tag-Along

(a) Bring-Along. If a Majority In Interest propose to sell or exchange all of the Units then held by the Majority In Interest (through a Transfer of Units, merger or otherwise), in an arm's length, bona fide transaction, with an unaffiliated third party ("Purchaser"), then, such Majority In Interest (the "Selling Members") shall initially be required to comply with the provisions of Section 7.8 hereof. If and to the extent that the right of first refusal set forth in Section 7.8 is not exercised with respect to all of the Units then held by the Selling Members, then the Selling Members may, at their option, require each other Members (the "Other Members") to sell all of their Units to the Purchaser (on the same terms and conditions as the Units to be sold by such Selling Members). The Selling Members will send written notice of the exercise of their rights pursuant to this Section 7.7(a) to each Other Members, setting forth the consideration per Unit to be paid by the Purchaser and all other terms and conditions of the transaction. Each Other Member will deliver all documents required to be executed in connection with the transaction. If a Member will fail to deliver such documents, the Company will cause the books and records of the Company to show that such Units are bound by the provisions of this Section 7.7(a) and that such Units will be transferred only to the Purchaser upon surrender for Transfer by the Member thereof.

(b) Tag-Along. If a Majority In Interest wish to sell their Units in accordance with Section 7.7(a) and do not exercise the right in Section 7.7(a), then the Majority In Interest will give notice of the proposed sale to the Other Members, setting forth the name and address of the prospective Purchaser, the proposed purchase price and the other terms and conditions of the offer. If the right of first

refusal set forth in Section 7.8 is not exercised, the Other Members will have the option (exercisable by notice given to the Company within twenty (20) days of the notice of the proposed sale under this Section) to include in the sale in place of or in addition to the securities that would otherwise be sold to the Purchaser by the Majority In Interest, such number, but not less than such number, of securities of the same class or series as is proposed to be sold by the Majority In Interest as is equal to the total number of Units to be purchased by the Offeror multiplied by a fraction, the numerator of which is the number of Units then held by the Other Members on a fully diluted basis and the denominator of which is the number of issued and outstanding Units (on a fully diluted basis) held by all Members.  The Majority In Interest may not agree to sell any of their Units to the Purchaser unless the Purchaser is willing to purchase Units in the manner provided in this Section, and any sale in violation of this Section will be void.  In the event the Other Members do not exercise their right during such 20-day period, such right will be deemed to be waived and the Majority In Interest will be entitled to sell such Units only pursuant to the terms and conditions of the offer and only if such sale is consummated within 120 days of the expiration of the 20- day period referred to in the immediately preceding sentence.

      7.8   <u>Right of First Refusal</u>.  Whenever a Member receives a bona fide third party offer to sell or otherwise voluntarily dispose of all or any part of such Member's Units, which such Member intends to accept, such Member will be required to offer such Units for sale only in accordance with the following procedures:

      (a)   The Member (the "<u>Transferor</u>") will deliver a written notice of the proposed Transfer (the "<u>Transfer Notice</u>") to the Company.  The Transfer Notice will contain a description of the proposed transaction and the terms thereof, including the number of Units to be Transferred, the name of each person to whom or in favor of whom the proposed Transfer will be made (the "<u>Transferee</u>") and a description of the consideration to be received by the Transferor upon Transfer of the Units.  The Transfer Notice will offer to first sell the Units to the Company.  Such offer to sell will contain the same terms and conditions and will be for the same consideration as described in the Transfer Notice.  However, where the Company reasonably requests it, Transferor may allow Company modified payment terms for the same total consideration.  For a period of ten (10) days after delivery of the Transfer Notice to the Company, the Company and/or one or more of the Company's assignee(s) may elect to purchase all or a portion of the Units.  If an alternative financing arrangement with the Transferor is to be suggested, the Company or its assignee(s) must do so in writing within five (5) days after delivery of the Transfer Notice and Transferor must respond with his or her counter or acceptance of the alternative financing arrangement within eight (8) days after the delivery of the Transfer Notice.  Within the ten (10) day period, Company must then accept the initial terms of the Transferee or the Transferor's counter offer for alternate financing terms with their election to purchase all or a portion of the Units.  Such election will be made by giving notice to the Transferor within such 10-day period, of the number of Units to be purchased by the Company and/or its assignee(s).  The foregoing offer to the Company to purchase Units will expire upon the Company's failure to notify the Transferor of the intent by the Company and/or its assignee(s) to purchase during such 10-day period, time being of the essence.

      (b)   If the Company does not agree to purchase all of the Units offered for sale by the Transferor within such ten (10) day period, the Transferor will have the right (subject to the prior approval of the Board as set forth in Section 7.1 hereof) to sell all Units that the Company does not agree to purchase (the "<u>Remaining Units</u>") to the Transferee named, and in strict accordance with the terms set forth, in the Transfer Notice; provided, however, that if such sale is not consummated within thirty (30) days from the date of the offer to the Company, such Remaining Units will again become subject to the requirements set forth in this Section.

      7.9   <u>Reserved.</u>

7.10    <u>Withdrawal</u>.  No Member will have the right to withdraw from the Company; however, upon application to the Board, the Board may, in its sole and absolute discretion, allow a Member to withdraw from the Company under terms and conditions determined by the Board at the time of withdrawal.

**ARTICLE VIII**
**TERM AND DISSOLUTION**

8.1    <u>Term</u>.  The Company will be effective from and after the date of filing of the Certificate as required under the Act.  The Company will continue in perpetuity, unless there is a dissolution of the Company pursuant to Section 8.2 and a liquidation of the Company in accordance with Section 8.4.

8.2    <u>Dissolution</u>.  The Company will be dissolved upon the occurrence of any of the following:

(a)    The entry of an order of judicial dissolution under Section 8972 of the Act;

(b)    The entry of a final judgment, order or decree of a court of competent jurisdiction granting relief to the Company in bankruptcy or insolvency, and the expiration of the period, if any, allowed by applicable law in which to appeal therefrom; or

(c)    The written consent of a Majority In Interest.

8.3    <u>Continuation of Company Business</u>.  The Company will not be dissolved upon a Member becoming bankrupt, or executing an assignment for the benefit of creditors, or the death, insanity, resignation, expulsion or dissolution of a Member.  Notwithstanding the foregoing, if the Company nevertheless becomes dissolved upon such event or any other event under applicable law, the Company will nevertheless not be dissolved if, pursuant to applicable state law and within ninety (90) days following such occurrence, a Majority In Interest (excluding the Member giving rise to the purported dissolution) will elect to reorganize and continue the business of the Company by a declaration in writing.

8.4    <u>Distribution on Liquidation</u>

(a)    Upon the dissolution of the Company by means of any occurrence described in Section 8.2 hereof, without reorganization of the Company in accordance with Section 8.3 hereof, the Liquidating Agent will proceed to liquidate the assets of the Company, wind up its affairs, and apply and distribute the proceeds in the following order of priority:

(i)    First, the Liquidating Agent will pay the debts and liabilities of the Company then outstanding, if any, and the expenses of liquidation, in the order of priority as provided by the Act and any other applicable law, and establish any reserves which the Liquidating Agent will deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.  Such reserves may be paid over by the Liquidating Agent to a bank or an attorney-at-law, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidating Agent will deem advisable, of distributing the balance in the manner provided in paragraph (ii) of this Section 8.4(a).

- 23 -

(ii)    Next, the Liquidating Agent will pay any balance of the proceeds to the Members in cash or in kind *pro rata* in proportion to their respective positive Capital Account balances.

(b)    Each Member will make, constitute, and appoint the Liquidating Agent, with full power of substitution, as the true and lawful attorney for such member and in such Member's name, place and stead and for such Member's use and benefit, to manage the business and affairs of the Company, to sell, lease, convey, exchange and mortgage its property or any portion thereof; to take title to its property or any portion thereof in the name of a nominee; to execute, acknowledge and deliver deeds, with or without warranty, leases, mortgages, releases, satisfactions and other instruments relating to its property or any portion thereof; and to do and perform each and every act and thing whatsoever necessary to be done in connection with its attorney-in-fact for the member hereunder, each Member will execute and deliver such power of attorney which will be irrevocable and durable, and will constitute a power coupled with an interest binding on the heirs, personal representatives, successors and assigns of each Member, as the Liquidating Agent may request.

(c)    A reasonable time will be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities so as to enable the Liquidating Agent to minimize any Losses otherwise incurred upon such a liquidation.

(d)    The Liquidating Agent will provide each Member with a financial statement for the period from the date of the last report prepared to the date of the final distribution of the proceeds of liquidation to the Members that shows the manner in which the proceeds of liquidation of the Company have been distributed.

(e)    The Company will terminate when all property owned by the Company will have been disposed of and the net proceeds, after satisfaction of liabilities to creditors, will have been distributed to the Members as aforesaid.

## ARTICLE IX
## INDEMNIFICATION

9.1    <u>Liability of Members</u>.  No Member will be liable, responsible or accountable in damages or otherwise to the Company or the other Members for any action taken or failure to act by such Member in its business judgment on behalf of the Company within the scope of the authority conferred to such Member by this Agreement unless such action or omission constitutes a breach or default under this Agreement, or gross negligence or willful misconduct.  Except as expressly provided in the Act, nothing in this Agreement will confer any rights or remedies under or by reason of this Agreement on any Person other than the Members and their respective successors and assigns, nor will anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement.  Nor will any provision of this Agreement give any third person any right of subrogation or action over or against any party to this Agreement.  Without limitation of the foregoing, no third party will have any right to enforce any contribution obligation of any Member, except as required by the Act.

9.2    <u>Right to Indemnification</u>.  Subject to the limitations and conditions provided in this Article IX and in the Act, each Person ("<u>Indemnified Person</u>") who was or is made a party or is threatened to be made a party to, or is involved in any threatened to be made a party to, or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("<u>Proceeding</u>"), or any appeal in such a Proceeding or any inquiry or

- 24 -

investigation that could lead to such a Proceeding, by reason of the fact that he was or is a Member, Director, or an officer of the Company or he was or is the legal representative of or a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a Member, Director, or of an officer of the Company, will be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any Proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, will not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any Proceeding, that the Indemnified Person had reasonable cause to believe that his conduct was unlawful.

9.3     Advance Payment. The right to indemnification conferred by this Article IX will include the right to be paid or reimbursed by the Company the reasonable expenses of the type entitled to be indemnified under this Article IX including the right to employ, at the expense of the Company, separate counsel of the Indemnified Person's choice in any such Proceeding described in Section 9.2 incurred by an Indemnified Person who was, is, or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; *provided,* that, the payment of such expenses incurred by any such Indemnified Person in advance of the final disposition of a Proceeding will be made upon delivery to the Company of a written affirmation by such Indemnified Person of such Indemnified Person's good faith belief that he has met the standard of conduct necessary for indemnification under this Article and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it will ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article or otherwise. For the purposes of this Section, the determination that the action or omission of any person constitutes fraud, bad faith, willful misconduct, recklessness, gross negligence, a transaction from which such Indemnified Person derived an improper personal benefit, or other acts or failures to act for which the Act or other applicable law does not permit such Indemnitee to be exculpated or indemnified will be made by a court of competent jurisdiction or other body before which the relevant Proceeding is pending. In the absence of a determination by such court or other body, such determination may be made by independent legal counsel in a written legal opinion to the Company. Independent counsel will be chosen by the Company (by the CEO unless that person is the Indemnified Person and then the Tax Matters Members) selecting three counsel options and then the Indemnified Person making a single selection from those three options.

9.4     Indemnification Rights Limited to Company Assets. The satisfaction of the obligations of the Company (or its receiver or trustee, as the case may be) under this Article will be from and limited to the assets of the Company and no Member will have any personal liability on account thereof.

9.5     Nonexclusivity of Rights. The right to indemnification and the advancement and payment of expenses conferred by this Article will be cumulative of, and in addition to, any other right which an Indemnified Person may otherwise be entitled by contract or as a matter of law or equity and will extend to such Indemnified Person's successors, assigns and legal representatives.

9.6     Insurance. The Board may cause the Company to purchase and maintain insurance, at the Company's expense, to protect the Company and any Person that may be indemnified under this Article.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1     Notices.  Any notice or communication pursuant to this Agreement will be in writing and will be deemed to be given (a) on the third (3rd) Business Day after the date of mailing if mailed by registered or certified mail, with postage prepaid, (b) if by hand delivery then upon delivery, or (c) if by courier, upon delivery by the courier. Notices and copies will be delivered to the addresses given by the Member to the Company.

10.2     Applicable Law.  This Agreement will be interpreted in accordance with and governed by the internal laws of the State of West Virginia.

10.3     Entire Agreement.  This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements between and among them respecting the subject matter of this Agreement.

10.4     Binding Effect.  This Agreement will be binding upon the parties and upon their successors and permitted assigns.

10.5     Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original but together will constitute one agreement.

10.6     Term.  This Agreement will become effective on the date hereof and will remain in full force and effect thereafter until the earlier of the termination by an instrument in writing by all parties hereto or the acquisition by one of the Members or their Permitted Transferees hereunder of all of the Membership Interests.

10.7     Amendments; Waivers.  This Agreement may not be amended or modified in any manner, and no provision hereof may be waived or discharged, except by an instrument in writing signed by the necessary parties hereunder.  Whenever any consent, waiver, agreement or other action of the Members or a group thereof is required or permitted hereunder, such action will be effective if it is taken by Members holding a Majority In Interest.  The failure of any party hereto to enforce at any time any provision of this Agreement will not be construed to be a waiver of any such provision or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement will be held to be a waiver of any other or subsequent breach.  This Agreement may be amended at any time and from time to time upon approval of Members holding a Majority In Interest.

10.8     Severability.  If any provision of this Agreement should be or become fully or partly invalid or unenforceable for any reason whatsoever or should violate any applicable law, this Agreement is to be considered divisible as to such provision and such provision is to be deemed deleted from this Agreement, and the remainder of this Agreement will be valid and binding as if such provision were not included herein.  There will be substituted for any such provision deemed to be deleted a suitable provision which, as far as is legally possible, comes nearest to what the parties desired or would have desired according to the sense and purpose of this Agreement, had they considered the point when concluding this Agreement.

10.9     Reserved.

10.10   <u>Construction</u>.  Every covenant, term, and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party).

10.11   <u>Time is of the Essence</u>.  Time is of the essence with respect to this Agreement.

10.12   <u>Venue; Waiver of Jury Trial</u>.  Each party hereby consents to the exclusive jurisdiction of any state court located in Monongalia County, West Virginia or federal court located in Harrison County, West Virginia, waives personal service of any and all process upon it, and consents to service of process by registered mail directed to it at the address given pursuant to Section 10.1.  Each party consents and agrees that venue of any action instituted under this Agreement or any agreement executed in connection herewith will be proper solely state courts located in Monongalia County, West Virginia and in federal courts located in Harrison County, West Virginia, and waives any objection to venue.  Each party waives any right to a jury trial.

10.13   <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended to confer any rights or remedies upon any person, other than the parties hereto and, subject to the restrictions on assignment herein contained, their respective successors and assigns.

10.14   <u>Certain Terminology</u>.  Whenever the words "including," "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words, "without limitation," immediately followed the same.

10.15   <u>Survival</u>.  Unless otherwise expressly provided herein, all obligations and liabilities accruing prior to the termination of this Agreement will survive the termination hereof.

[*Remaining Page Left Intentionally Blank; Signature Page Follows*]

**IN WITNESS WHEREOF**, the parties, who are the Members with rights to authorize any such amended operating agreement, have executed this Agreement as of the day and year first above written.

**COVAN HOLDING COMPANY, LLC**

_____
Zenovy Wowczuk, Chairman & CEO

_____
Adam Hanasky, Vice President

- 28 -

**Exhibit A**
**To**
**Second Amended & Operating Agreement for Covan Holding Company, LLC**

**Current as of May 31, 2018**

| | | Class A Units | | Class B Units* | | Total | | |
|---|---|---|---|---|---|---|---|---|
| | No. | Capital Contribution | Percentage (Out of Class A Units) | No. | Percentage (Out of Class B Units as of May 31, 2018)* | No. | Capital Account | Percentage Interest |
| Zenovy Wowczuk | 60,000 | $600.00 | 60.00% | 0 | 0.00% | 60,000 | $600.00 | 60.00% |
| Daniel Schmitt | 40,000 | $400.00 | 40.00% | 0 | 0.00% | 40,000 | $400.00 | 40.00% |
| | | | | | | | | |
| | | | | | | | | |
| Total | | | 100.00% | 0 | 0% | 100,000 | $1,000.00 | 100.00% |

## CONFIDENTIAL SEPARATION AGREEMENT AND MUTUAL GENERAL RELEASE

This Confidential Separation Agreement and Mutual General Release (sometimes referred to as "Agreement" or "Release") is entered into, effective as of the date of execution by the last party hereto to sign, by and between Daniel Schmitt ("Employee") and Guard Unit, LLC ("Employer").

WHEREAS, Employee was employed by Employer until August 24, 2022, at which time Employee's Employment with Employer ended, and upon agreement of the parties, Employee shall be deemed to have resigned as of that date; and

WHEREAS, though Employer has no obligation to do so, Employer desires to provide certain benefits to Employee and, prior to doing so, Employer and Employee wish to resolve, finally and completely with prejudice, and without judicial or administrative intervention, any and all other matters between them for all possible claims for injuries or damages of every kind and description which Employee may have, including, but not limited to, any claim relating to Employee's employment with Employer, the terms and conditions of that employment, and the separation from that employment.

NOW, THEREFORE, in consideration of the above recitals and mutual promises and covenants set forth below, Employee and Employer, each intending to be legally bound, agree as follows:

SECTION 1 – PAYMENT

A. AMOUNT AND TIME OF PAYMENT: As consideration for Employee's execution of this Confidential Separation Agreement and Mutual General Release, Employer agrees to pay to Employee, and Employee agrees to accept from Employer, the sum total of $350,000 less withholdings required by law as consideration for the additional items released by Employee and Employer pursuant to this Agreement by one bank check dated and delivered eight days after the conclusion of the revocation period (or November 1, 2022 if the Agreement is signed on October 17, 2022) and provides the Employer with an executed IRS W-9. Employee acknowledges there is no other vacation, paid leave, or financial compensation to which he is entitled.

B. CONTINUED HEALTH COVERAGE: To the extent applicable, Employee will be entitled to continued health plan coverage under the normal COBRA continuation rules as long as Employee elects such coverage for the specified time frame, but the payment for those benefits shall be the obligation of Employee.

C. SUFFICIENCY OF CONSIDERATION: Employee acknowledges that some or all of the above-referenced payment is something of value to which he is not otherwise entitled and which would not occur except for the execution of this Agreement and the fulfillment of the promises contained herein. Employee further agrees that the payment and actions constitute full, final, and complete satisfaction of any and all Claims by Employee against the Employer, including but not limited to Claims which exist or which may exist

1

based on or in any way arising or related to Employee's employment with the Employer or his separation therefrom.

Employer acknowledges that, by executing this Release, some or all of the actions, covenants and undertakings of Employee detailed herein are something of value which would not occur except for the execution of this Agreement and the fulfillment of the promises contained herein. Employer further agrees that the actions Employee undertakes will, upon completion, constitute full, final, and complete satisfaction of any and all Claims by Employer and Released Parties (hereinafter defined) against the Employee, including but not limited to Claims which exist or which may exist based on or in any way arising or related to Employee's employment with the Employer or his separation therefrom.

SECTION 2 -- COMPLETE RELEASE

A. IN GENERAL: Employee agrees to irrevocably and unconditionally release any and all claims Employee may now have against Employer and the Released Parties as set forth in this Section 2.

B. RELEASED PARTIES: The Released Parties are Employer and any related entity, and their past and present programs, employees, officers, directors, members, representatives, managers, supervisors, agents, insurers, employee benefits plans, funds, programs, or arrangements providing pension, welfare and fringe benefits, and any successors and/or assigns, jointly and individually. "Released Parties" include Covan Holdings Company, LLC; Covan Solutions, LLC; Kinetic Leader Group, LLC; Necessity Ventures, LLC; Necessity Ventures Tactical Investments, LLC; Civil-Military Innovation Institute Inc.; and Raven Rock Services, LLC, their owners, investors, attorney and agents.

C. CLAIMS RELEASED: Employee understands and agrees that Employee is releasing all known and unknown claims, promises, causes of action, or similar rights of any type that Employee may have (the "Claims") against any Released Party arising out of or in any way related to Employee's employment with Employer, the terms and conditions of Employee's employment with Employer, and the continuing effect thereof. Employee further understands that the claims Employee is releasing may arise under many different laws and under many possible legal, equitable, statutory, equity, common law, tort or contract or any local, state or federal statute, including but not limited to the following:

(i) Anti-discrimination statutes, such as the Age Discrimination in Employment Act, the Older Workers Benefits Protection Act, and Executive Order 11141, and their amendments; the Civil Rights Act of 1866 or Title VII of the Civil Rights Act of 1964, and any of their amendments; the Equal Pay Act, and any of its amendments; the Americans With Disabilities Act and Sections 503 and 504 of the Rehabilitation Act of 1973, and any of their amendments; the West Virginia Human Rights Act, W. Va. Code § 5-11-1 *et seq.*, and any of its amendments; and any other federal, state, or local law prohibiting employment discrimination, harassment, or retaliation of any kind.

(ii) Employment statutes, such as the Employee Retirement Income Security Act of 1974, and any of it amendments; the Fair Labor Standards Act of 1993, and any of its amendments; the Family and Medical Leave Act of 1993, and its

2

amendments; the Worker Adjustment and Retraining Notification Act, and any of its amendments; and any other local, federal or state laws relating to employment, such as veterans' reemployment rights law, including but not limited to USERRA (38 USC §4301, *et seq.*).

(iii) Other laws, such as any federal, state, or local laws restricting an employer's right to terminate employees, or otherwise regulating employment; any federal, state, or local laws enforcing express or implied employment contracts or requiring employers to deal with employees fairly or in good faith; and any violations of public policy.

(iv) <u>Tort and Contract Claims</u>, such as claims for wrongful or constructive discharge, physical or personal injury, emotional distress, the tort of outrage, fraud, fraud in the inducement, negligent misrepresentation, defamation, invasion of privacy, interference with contract or with prospective economic advantage, breach of express or implied contract, breach of covenants of good faith and fair dealing, and similar or related claims.

(v) <u>Other examples of released Claims.</u> include, but are not limited to: (a) Claims for compensation, bonuses, lost wages, or unused sick pay; (b) Claims that in any way relate to the design or administration of any employee benefit program; (c) Claims for severance or similar benefits or for post-employment health or group insurance benefits; (d) Claims for the fees, costs, or expenses of any and all attorneys who represent or have represented Employee in connection with this Release; or (e) any and all claims for attorney fees and costs.

(vi) <u>Unknown Claims</u>. Employee understands that Employee is releasing Claims that Employee may not know about. Employee knowingly and voluntarily intends to release these Claims, even though Employee recognizes that someday Employee might learn that some or all of the facts Employee currently believes to be true are untrue and even though Employee might then regret having signed this Release. Nevertheless, Employee is assuming that risk and Employee agrees that this Release shall remain effective in all respects in any such case. Employee expressly waives all rights that Employee might have under any law that is intended to protect Employee from waiving unknown claims and Employee understands the significance of doing so.

Employee also covenants that, to Employee's knowledge, Employee has not sustained any work-related injury during Employee's employment at Employer.

Employee also covenants that, to Employee's knowledge, Employee has been paid all compensation, wages, and benefits to which he was entitled during his employment with Employer, including paid and unpaid leave.

Employee also covenants that, to Employee's knowledge, Employee has submitted and has received payment for any and all expenses that are reimbursable in accordance with Employer's policy.

(vii) <u>Covenant Not To Sue</u>. In exchange for the consideration referenced in paragraph Section 1.A., and as an inducement to the Released Parties to give the same,

3

Employee covenants and agrees that he does not possess any claim, will not sue, bring any action, or make any demand or claim in any administrative or judicial forum against the Employer and Released Parties with respect to any claims, demands, liabilities, or obligations described in this Agreement.

D. LIMITATIONS ON RELEASE: Employee does not waive, nor shall this Release be construed to waive, any right which is not subject to waiver as a matter of law, or any right which arises after the effective date of this Release. Employee agrees not to file, join in, or prosecute any lawsuits against Employer concerning any matter, act, occurrence, or transaction that arose on or before the date Employee signs this Release. Although Employee is not precluded from filing a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") or a parallel state or local agency, or participating in an investigation conducted by the EEOC or a parallel state or local agency, to the maximum extent permitted by law, Employee expressly waives his right to any monetary recovery or any other individual relief in connection with (i) any charge filed with the EEOC or a parallel state or local agency arising out of or related to his employment and/or the severing of that employment with Employer, or (ii) any claim pursued on Employee's behalf by any federal, state, or local administrative agency, or any other person arising out of or related to his employment and/or the severing of that employment with Employer. Employee expressly acknowledges and agrees that as of the date he signs this Release, he has not filed any grievances, claims, complaints, administrative charges, or lawsuits against Employer. Nothing in this Release shall limit Employee's or Employer's right to file and prosecute any claim based on Employer's or Employee's breach of this Release.

EMPLOYER'S RELEASE: Employer, for itself, its successors and assigns, its employees, officers, directors, members, representatives, managers, supervisors, agents and insurers, agrees irrevocably and unconditionally to release any and all claims, whether known or unknown, Employer may have against Employee, his heirs, successors and assigns.

EMPLOYER'S INDEMNIFICATION: Employer expressly waives, releases and forever discharges Employee from any and all claims for attorneys' fees, costs and/or expenses of any kind. Employer also hereby indemnifies and holds Employee harmless of and from any liability for the payment of any attorneys' fees, costs, or expenses of any attorney who has represented Employer relating to the subject matter of this Release as limited by Subsection D LIMITATIONS ON RELEASE and EMPLOYER'S RELEASE above.

SECTION 3 -- EMPLOYEE'S PROMISES

A. NO FURTHER EMPLOYMENT: By the execution of this Release, Employee expressly agrees that (i) Employee will not seek employment and/or reemployment or reinstatement to employment with Employer or any Released Party, now or in the future; and (ii) Neither Employer nor any Released Party shall have any obligation to employ, reemploy, or engage Employee in any fashion or at any time, whether as an employee or in any other capacity.

4

B. PROJECT STATUS UPDATE: Employee affirms that he will promptly provide Employer with a written status (through email or otherwise) of all projects with which he is currently involved related to his Employment with Employer, if applicable.

C. CLAIMS REPRESENTATIONS AND PROMISES: Employee affirms that Employee has no information concerning any conduct involving Employer, Released Parties, or any related entity which Employee has any reason to believe may be unlawful. Employee promises to cooperate fully in any investigation Released Parties or any related entity undertake into any matters that occurred during Employee's employment with Employer. Employee understands that nothing in this Release prevents Employee from cooperating with any government investigation. In addition, to the fullest extent permitted by law, Employee hereby irrevocably assigns to the government any right Employee might have to any proceeds or awards in connection with any proceedings against the Released Parties or any related entity.

D. TAXES: Employee agrees that Employer is required by law to make certain deductions from any payment referenced in Section 1.A. Further, Employee agrees that Employer shall not be required to pay any further sum to Employee, or to any other person or entity, for any reason as part of this Release even if the tax liabilities and consequences to Employee are ultimately assessed in a fashion which Employee does not presently anticipate.

E. INDEMNIFICATION: Employee expressly waives, releases and forever discharges Employer and any Releasee from any and all claims for attorneys' fees, costs and/or expenses of any kind. Employee also hereby indemnifies and holds Employer harmless of and from any liability for the payment of any attorneys' fees, costs, or expenses of any attorney who has represented Employee relating to the subject matter of this Release.

F. OWNERSHIP OF CLAIMS: Neither Employee nor Employer has assigned or transferred any Claim Employee or Employer is releasing, nor has either Employer or Employee purported to do so. Employee represents that there are no liens on the proceeds paid herein from any person or entity of which Employee is aware. Employee represents that Employee has not made Employer or any Related Party aware of any liens on the proceeds to be paid herein. Employee further warrants that, in the event any liens are made, those liens are to be paid by Employee.

G. NONADMISSION OF LIABILITY: Employee and Employer agree that Employee's and Employer's entry into this Release is not to be construed as, and is not, an admission that Employer, Employee, or any Released Party violated any of his or its duties or obligations to any Released Party and that no Released Party treated Employee improperly, unlawfully, or unfairly in any manner whatsoever. Neither this Release nor the implementation thereof shall be construed to be, or shall be admissible in any proceedings as, evidence of an admission by Employer or any Released Party of any violation of or failure to comply with any federal, state, or local law, common law, agreement, rule, regulation, or order.

H. IMPLEMENTATION: Employee and Employee agree to sign any documents and do anything else that is necessary in the future to implement this Release and Employer

5

agrees to use its best efforts to cause all Released Parties to do all things necessary or appropriate to implement this Release.

I. COMPANY PROPERTY: Before accepting any monetary payment from Employer, Employee promises to return to Employer all files, memoranda, documents, records, electronic records, software, copies of the foregoing, credit cards, keys, and any other property of Employer or any other Released Party in Employee's possession.

J. NON-DISPARAGEMENT: Employee and Released Parties agree not to criticize, denigrate, or disparage Employee, Employer or any Released Party. However, nothing in this paragraph restricts Employee's right to testify truthfully in a legal matter.

K. CONFIDENTIAL INFORMATION: Employee hereby acknowledges that, during the course of Employee's employment, Employee gained knowledge or information of a confidential nature in which Employer has a proprietary interest. Employee agrees not to disclose to any person or any entity any confidential, proprietary or trade secret information of or about Employer, without the express written authorization and consent of Employer. Any confidential information regarding Employee such as health and financial information gained or learned by Employer or any Released Party is private and this information will not be disclosed as conditioned by the language below.  However, with respect to Confidential Information held by Employee, or the Employer and other released parties, Confidential Information will not include information that:

(a) is, as of the date of this Release, or hereafter becomes, through no act or failure to act on the part of the Employee, Employer or the released parties generally known or readily ascertainable through proper means to persons knowledgeable in the relevant industry;

(b) was acquired or lawfully in the possession of the Employee, the Employer or the released parties by proper means without restriction as to use or disclosure before receiving such information from the Employee, Employer or any Released Party;

(c) becomes available to the Employee, Employer, or the released parties on a non-confidential basis from a source other than the Employee, Employer or any Released Party, provided that such source is not bound by a confidentiality agreement or otherwise prohibited from disclosing such information to the Employee, Employer or any Released Party by a contractual, legal or fiduciary obligation or any lawful or obligation or legal process of the Employee, Employer or a released party to disclose such information in conformance with law; or

(d) was independently developed by the Employee, Employer or a released party without knowledge or use of the Employee, Employer or any Released Party's Confidential Information

L. CONFIDENTIALITY: Employee and Employer agree that the terms of this Release are **STRICTLY CONFIDENTIAL**. Employee and Employer agree not to

6

disclose the underlying facts that led up to this Release or the terms or amount payable under this Release to anyone other than their management and legal or financial advisors and, even as to such persons, only if the person agrees to honor this confidentiality requirement. Such a person's violation of this confidentiality requirement will be treated as a violation of this Release. This subsection does not prohibit disclosure of the terms or the amount payable of this Release to the extent necessary legally to enforce this Release, nor does it prohibit disclosure to the extent otherwise legally required.

M. CONSEQUENCES OF VIOLATING ANY PROMISES: The parties agree to pay the reasonable attorneys' fees and any damages any party may incur as a result of the other party's breach of this Release. Employee further agrees that Employer would be irreparably harmed by any actual or threatened violation of Section 3 that involves disclosure of the terms or amount payable under this Release, and that Employer will be entitled to an injunction prohibiting Employee from committing any such violation.

SECTION 4 -- REVIEW AND REVOCATION

REVIEW: Employee acknowledges and agrees that Employee's waiver of rights under this Release is knowing and voluntary and complies in full with all criteria set forth under the West Virginia Human Rights Act, W. Va. Code § 5-11-1 *et seq.,* the regulations governing waivers of rights under the West Virginia Human Rights Act as set forth in West Virginia Code of State Rules § 77-6-1 *et seq.,* and further complies in full with all criteria set forth in the statutes and regulations promulgated under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and any and all federal, state and local laws, regulations, and orders. Employee ***expressly warrants that Employee is advised hereby in writing of Employee's right to consult with an attorney prior to executing this Release.*** The toll-free telephone number of the **West Virginia State Bar Association is 1-866-989-8227.** Employee further expressly warrants that Employee has had the opportunity to consult with, and to be advised by, an attorney of Employee's choosing before executing this Release to help Employee fully understand and appreciate its legal effect. **Employee acknowledges that Employee has been afforded the opportunity to consider this Release for a period of over 21 days,** which period ended October 15, 2022 which is a reasonable period of time. In the event that Employee executes this Release prior to the expiration of the aforesaid 21-day period, Employee acknowledges that Employee's execution of the Release was knowing and voluntary and was not induced in any way by Employer or any other person.

REVOCATION: Employee shall have a period **of seven (7) days** following Employee's execution of this Release to revoke it, and this Release shall not be effective or enforceable prior to the expiration of that period. Revocation can *be made* by delivering written notification to Civil-Military Innovation Institute, Inc., Attention: Adam Hanasky at 3592 Collins Ferry Rd., Ste 230, Morg*antown,* WV 26505; and returning any amounts that have already been paid under this Release. If Employee does not advise Employer in writing that Employee revokes this Release within seven (7) days of Employee's execution of it, this Release shall be forever enforceable.

SECTION 5 – MISCELLANEOUS

7

A. ENTIRE AGREEMENT: Employee understands and agrees that the terms *and conditions of this Release constitute the full and complete understandings, agreements, and promises between Employee and Employer with* respect to all matters covered by this **Release, that there are no other agreements, covenants**, promises, or arrangements between Employee and Employer other than those set forth herein, and that the terms and conditions of this Release cancel and supersede any prior understandings or agreements that may have been made between Employee and **Employer with respect to all matters covered by this Release, and that no other promise or inducement has been offer**ed to Employee except as set forth herein.

B. SEVERABILITY: If any term, condition, clause, or provision of this Release shall be determined by a court of competent jurisdiction to be void or invalid at law, or for any other reason, then only that term, condition, clause or provision, as is determined to be void or invalid, shall be stricken from this Release, and this Release shall **remain in full force** and effect in all other respects.

C. SUCCESSORS: This Release binds Employee, Employee's heirs, administrators, representatives, executors, successors, and assigns, and will inure to the benefit of all Released Parties and their respective heirs, administrators, representatives, executors, successors, and assigns. Employer warrants that this Release also binds the Released Parties, their successors and assigns, and will inure to the benefit of Employee, his heirs, administrators, representatives, executors, successors and assigns.

D. INTERPRETATION: This Release shall be construed as a whole according to its fair meaning. It shall not be construed strictly for or against Employee or any Released Party. Captions are intended solely for convenience of reference and shall not be used in the interpretation of this Release. This Release shall be governed by the statutes and common law of West Virginia.

E. NOTICES. Notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be given in writing and will be deemed to have been properly given, delivered or served by hand delivery or three days after depositing same in a receptacle under the exclusive control of the United States Postal Service, postage prepaid, certified mail, return receipt requested, to be made to the following addresses:

If to Employee:

>    Daniel Schmitt
>    206 Rock Hill Church Rd,
>    Stafford, VA 22556

With a copy to:

>    Andrew F. Blumenthal, Esq.
>    250 West 57th Street - Suite 1619
>    New York, New York 10107

If to Guard Unit LLC:

>    GUARD UNIT, LLC
>    3592 Collins Ferry Road, Suite 230
>    Morgantown, WV 26505

With a copy to:

>    Mark A. Carter, Esq.
>    Dinsmore & Shohl, LLP
>    707 Virginia Street, East
>    Suite 1300
>    Charleston, WV 25301

A party will have the right to change such party's address for notices hereunder by giving written notice thereof to the other party as provided above.

**Daniel Schmitt acknowledges that he has carefully read the foregoing Release, that he understands completely its contents, that he understands the significance and consequences of signing it, and that he intends to be legally bound by its terms. Daniel Schmitt further acknowledges that he has had a reasonable and sufficient period of time within which to consider this Release and that he has had the opportunity to review this Release with counsel. Daniel Schmitt swears that he has agreed to and signed this Release voluntarily and as his own free will, act, and deed, and for full and sufficient consideration.**

**IN WITNESS WHEREOF,** Guard Unit, LLC **and** Daniel Schmitt have caused this Confidential Separation Agreement and General Release to be executed as of this _____ day of October, 2022.

9

**Guard Unit, LLC**
**("Employer")**

Signature: _____

Title: CHAIRMAN

Date: ____10/17/2022____

**Daniel Schmitt**
**("Employee")**

Signature: _____

Date: ___10/18/2022___

26834351.1